Good morning. Good morning, Your Honors. Kristen Hausch of Latham & Watkins, appearing pro bono on behalf of Appellant Kelvin Singleton. Thank you, Ms. Hausch. May it please the Court. Mr. Singleton suffered nearly two years of excruciating back pain because defendants delayed in providing the treatment prescribed by his orthopedic specialist. It was not until Mr. Singleton filed a lawsuit, a state habeas petition, and the federal receiver ordered the defendants to provide that treatment that they actually went ahead and did it. And after he received that prescribed treatment, epidural steroid injections in his back, his pain was relieved. Defendants could have alleviated that pain months and months earlier, but they sat idly by and simply chose not to do so. This circuit has already found that that type of conduct constitutes deliberate indifference to an inmate's serious medical needs in violation of the Eighth Amendment's prescription on cruel and unusual punishment. In Jet v. Penner, this Court reversed a grant of summary judgment on almost identical facts. In that case, the inmate broke his thumb, the emergency room physician ordered that he be sent to an orthopedic specialist, and yet the defendant doctor delayed for six months in sending him to that orthopedic specialist, causing him to needlessly suffer pain. This Court found a tribal deliberate indifference claim on those facts, and for the same reason, it should find a tribal deliberate indifference claim in this case. Unfortunately, defendants' interference with prescribed treatment did not stop at Mr. Singleton's back condition. Mr. Singleton suffered two months of eye pain and swelling. His primary care physician ordered urgent treatment by an eye specialist. Under the prison's own policy, urgent treatment is supposed to be provided within 14 days, and yet the defendants delayed for 11 months in sending him to an ophthalmologist. And by that time, he had already suffered a permanent blind spot in his left eye, spanning 50 percent of his left eye. What's the evidence of that? So Dr. Yackley is an ophthalmologist, and he evaluated Mr. Singleton 11 months after he had initially started experiencing eye pain and swelling, and he found a visual defect spanning 50 percent of Mr. Singleton's left eye. Is that an objective sign, or is that a subjective symptom that the patient reports? Well, they do a test, and it's – I don't know if you're familiar, but when you see the – you look through this kind of hole and you click the button whenever you see lights. So that registered on three separate occasions. In other words, he says, I can't see the – I can't see the thing. It doesn't click the button. That's correct. So that's a subjective report on his part. Right. But it's objective in that Dr. Yackley noted that it was on three separate occasions that that same exact thing was occurring, that on 50 percent of his left eye, he wasn't seeing. Is there any evidence that your client could have been helped by an ophthalmologist? Had the ophthalmologist seen him earlier? Yes. Mr. Singleton suffered an eye stroke, and it's a jury – a reasonable jury could infer that had Mr. Singleton simply received ophthalmological care during the time period in which he was experiencing the warning symptoms leading up to the stroke, that that stroke could have been prevented. The ophthalmologist's report doesn't seem to substantiate that. The ophthalmologist, as I read the report, at least seemed to feel that there wasn't much that could have been done, either with respect to pain or with respect to vision. Dr. Yackley submitted an after-the-fact declaration that said that because he personally couldn't determine 10 months after those warning symptoms leading up to the stroke what had actually occurred, that an ophthalmologist who would have looked at him during that two-month time period in which he was actually experiencing those warning symptoms couldn't have done anything. But that's an erroneous conclusion, and it's contradicted by the record. And this Court held in Lemire v. California Department of Corrections that if reasonable minds can differ on the issue of causation, that summary judgment is inappropriate. Well, you say it's an erroneous conclusion. On what basis? Well, because he didn't evaluate Mr. Singleton while he was experiencing those warning symptoms leading up to the eye stroke. And Mr. Singleton is entitled to an inference that had he simply been seen by an ophthalmologist and received that care, he, that stroke could have been prevented, perhaps most easily because the doctor could have simply provided him with blood thinners and removed the clot in his eye. Anybody say that in the record? There was an ophthalmologist that was able to diagnose this eye stroke. What's that doctor's name? That doctor's name is Dr. Lee. I don't see a report from him. That doctor was at his other prison at the Calipatria, and that's at ER 88. And actually, the district court refused to consider that evidence, and that's another area that we're at. On what ground? On what ground? On what ground? It found that it was hearsay, but it was a prison medical record that falls squarely within the business records. Well, wait a minute. We're talking about ER 88 is a document apparently authored by Dr. Finiter. Yes. I'm sorry, Your Honor. Right. So we don't have anything from Dr. Lee, do we? No. That was actually the optometrist that had ordered that he actually be seen by an ophthalmologist. Getting back to my question, nobody's real. We don't have anything in the record diagnosing him with an eye stroke. Dr. Finiter found that he had an eye stroke. No, not really. Dr. Finiter says he looked at a record, and an unnamed ophthalmologist diagnosed an eye stroke. Right. But let's be accurate about the facts. We don't have anybody who saw him who says he has an eye stroke. Well, I respectfully disagree. Who diagnosed the eye stroke? The unnamed ophthalmologist. And had Mr. Singleton had more time to look at it. That's what I said. It's unnamed ophthalmologist. We don't have anything from that person who diagnosed it in the record is what I'm asking you. Right. But the doctor looked at that ophthalmologist. Dr. Finiter looked at something from somebody and says he, somebody diagnosed an eye stroke. Right. Counsel, I thought that what the evidence said was that there was a possible eye stroke, that it used the word possible. Am I right in that? That's correct, Your Honor. Now, so things might have changed since I was a litigator. But it used to be that one would have to present admissible evidence in opposition to a Rule 56 motion. So is the law now that something can be submitted that's hearsay as long as the party indicates that they can present admissible evidence at trial? That's correct. The Court should look at whether that evidence can be presented in an admissible form at trial. And perhaps most easily this could be presented in a way that the ophthalmologist could actually get on the stand and testify that that vision loss was caused by an eye stroke. Okay. Now, is that change in the rule from, you know, from what I recalled decades ago, is that based on a rule change of Rule 56? Yes. Or a Supreme Court ruling or circuit precedent? Right. Rule 56E says that, Your Honor, that the Court is to look to the form of the evidence rather – whether it can be presented in admissible form. And I would argue that it can. When the hearsay is presented, that doctor says an ophthalmologist said it was possibly an eye stroke. So you get past the hearsay then under Rule 56E. But why does possibly make it relevant as opposed to, you know, anything's possible? Right. Because a jury could have inferred that had he been seen by an ophthalmologist during the time period that he was actually symptomatic, that that vision loss could have been prevented, and, you know, he's entitled to that jury inference on summary judgment as a nonmovement. I see you have about 30 seconds left. I do. I'd like to reserve the remainder of my time for a bit, Your Honor. You got it. Thank you. Thank you. Good morning. Good morning. Thank you, Your Honor. May it please the Court, I'm Suzanne Antley. I represent the Applegate Defendants. Could you pull the mic down a little closer to you? Thank you. Yes. Is that better? Yes, thanks. Okay. There are two bits of undisputed evidence in the record on this case that show that the district court properly granted summary judgment for the defendants. First, Mr. Singleton himself testified that he could not trace any delay or denial of the medical care that he wanted to any of the individual defendants. And that's undisputed. That's at page 554 of the record. Undisputed by anything else in the record. Second, Dr. Yapley, the ophthalmologist, testified that the delay in seeing an ophthalmologist did not cause Mr. Singleton's vision loss. That's at page 328 of the record, and it's undisputed. Now, those two items alone warrant affirmance of summary judgment. But in addition, there are some key significant absences from the record. First. May I ask you about one particular area, though, that does concern me with respect to the back pain? It took a very long time for this man to see a pain management specialist. When he did see the pain management specialist, the pain management specialist not only treated him with the injections, which relieved the pain, but also increased his medication. Can't we, therefore, infer, or couldn't a jury infer, that the delay in seeing the pain management specialist caused this man unnecessary pain for a very long time? And isn't that in itself compensable? Not on the record, Your Honor. First of all, there's no evidence in the record that any of the individual defendants consciously or purposefully denied him the right to see the pain management specialist. And there's no evidence in the record that any of the individual defendants caused him that harm or pain. In addition, the record shows that Mr. Singleton began experiencing lower back pain way back in 1988 when he fell off of a horse. He experienced that pain all during those years before he came to Kern Valley. He experienced that pain all during while he was at Kern Valley. And even after he saw the pain. Isn't there a question as to the etiology of that pain? In fact, one of the physicians submitted a statement saying, you don't get this kind of pain when you've fallen off a horse. I believe that the etiology of the pain is undisputed. The records repeatedly show that he began experiencing that pain back in 1988. And even after he saw the pain management specialist, when he transferred out to the way after he saw the pain management specialist, when he's transferred out to Calipatria, even then he told the staff, medical staff at Calipatria that he had been experiencing lower back pain since 1988 continuously. So there's a real lack of evidence of any causation. And it's a fundamental requirement of deliberate indifference. Counsel, I'd like that. Go ahead, Judge Silberman. Lack of causation. I don't understand what you mean by lack of causation. Well, under case law, for example, Lemire, the defendants in a deliberate indifference case, conduct has to be both the actual and the proximate cause of the harm or the pain. And if he has a preexisting condition and it goes to prison, they can just blow it off? Well, the record shows that not only did he receive extensive, frequent, regular attention. That's a different issue. Well, but what it showed, I'm sorry, Your Honor. What the record shows is that Mr. Singleton received frequent back pain consultations, physical therapy, and extensive, serious, heavy-duty pain medications, including OxyContin, Percocet, codeine, morphine, neurotic. Why did the receiver have to intercede to get him treatment? The Federal's receiver records do not show that that's what caused him to begin to get treatment. The records show that he was receiving that treatment the entire time. That's undisputed. Judge Gould, I think, had a question. Yes, counsel. I have a question on the causation relating to his eye problems. I don't really understand why the prison didn't get him to an ophthalmologist earlier. So as I understood the record, he had an optometrist or some other doctor who said he should get a specialist, an ophthalmologist, but then he didn't get one. And then he appealed that, and some nurses told him if he would drop his appeal, they'd be able to get him the ophthalmologist, and he did that, and he didn't get the ophthalmologist. So, you know, I don't really understand the causation argument that in his testimony he said he couldn't trace the problem to any of the defendants. Thank you, Your Honor. The record shows that Mr. Singleton, when he first began experiencing the eye pain that concerned him, he reported that to Dr. Acano. Dr. Acano responded reasonably by referring him to an optometrist to look at that pain. The only other defendant that the record shows knew about that request and that report of pain was Dr. Youssef, who approved, who approved the request for a specialist. There's no evidence in the record that any other defendant knew about the request for an ophthalmologist, the report of pain, and the most important was that Dr. Youssef denied the request for urgent consultation. Is that inaccurate? That is inaccurate. I believe it was at the page. I can't remember the page. That's what triggered his appeal of 831.07. It's at 432 of the record. It shows that on September 1st, Dr. Acano heard Mr. Singleton's report of pain and made an urgent request, and on that document it says approved, circled, and signed. Dr. Youssef didn't cancel that? No. There's nothing in the record to show that. And the most important thing regarding the his seeing an ophthalmologist, here's the most important thing. Dr. Yackley, the ophthalmologist who examined him, testified without dispute that the delay in seeing an ophthalmologist did not cause the vision loss. And here's a significant factor. Even after the vision loss, even after Mr. Singleton was examined by Dr. Yackley and various other ophthalmologists and specialists, none of those specialists disputed Dr. Yackley's testimony that the delay did not cause the vision loss. But here's ‑‑ this is really important. None of them ever recommended any treatment other than the same treatment he was getting before he had the vision loss. And those specialists ‑‑ Counsel, let me ask a question on that. You know, if an ophthalmologist tested him and found that he had excessive eye pressure in his eye that could cause a loss of vision, wouldn't there be some other treatment they would give beyond what he was getting? The record shows that Mr. Singleton was receiving consistent, regular treatment and medication for his ophthalmology ‑‑ I mean, for his glaucoma. And every test that was conducted on his eye pressure showed that it was always within normal range. There was nothing to indicate to any of the defendants, even if they had noticed, there was nothing to indicate to them that there was a risk. And it's interesting that all of the specialists who examined him after the vision loss, they didn't recommend any different treatment. There is nothing in the record to indicate that anybody should have foreseen that risk. Okay. Let me ask you another question. I think the magistrate judge denied a request for an expert. Right. And stated that there were no funds for an expert, which is true. However, we have a Ninth Circuit opinion in a case called McKinney. It was an opinion of Judge Prakerson that said that although there are no funds from the government for an expert, that a court ‑‑ the district court has discretion to order that an expert be paid by the defendants in the case if the court wants to do that. That was initially vacated by the Supreme Court, which vacated and remanded to consider some other case. But when the panel got the case back, it looked at the other case, said it didn't matter, and said it reinstated McKinney. So why wasn't the magistrate wrong in stating the wrong standard about whether the court could appoint an expert? He never got to the second step of saying, okay, I've got discretion to do it, but I'm not going to do it. Right. Thank you, Your Honor. The case law that have considered that issue have indicated that an expert is appropriately appointed when there is a dispute of fact. And late in the case, for example, Harrell v. Yates, should be done late in the case for trial purposes. It's never been suggested that an expert should be appointed for the purpose of creating an issue of fact. And here, Dr. Yappley's testimony was at all times undisputed that the delay did not cause the vision loss. There's only speculation about what did cause it, but nobody's disputed that the delay did not cause it. And if the case ever went to trial, like the Court said in Harrell v. Yates, then if there's an issue of fact that's disputed that the Court needs assistance in understanding, then, yes, it would be appropriate, possibly, to appoint an expert. But not at this stage of the litigation where there's not even a dispute of fact. I understand. I mean, how can there be a dispute if there's only one doctor in the case? Well, none of the other doctors who examined him ever disputed that ‑‑ ever disputed that testimony. There's been no suggestion by anything in the record. Is Dr. Yappley the only ophthalmologist in the case? Well, there are records from other ophthalmologists. No, but I mean, Dr. Yappley is the only ophthalmologist. There's no other ophthalmologist. I believe that the record shows Dr. Fernander was an ophthalmologist. And in fact ‑‑ The one who reviewed the record? The one that reviewed the record. And he didn't see the patient? I believe Dr. Fernander did see the patient, yes. And ‑‑ Are you sure about that? No. But I believe so because I believe that was at a ‑‑ later in the process. But in any event, none of those ‑‑ Dr. Fernander was the chief medical executive. I don't have the impression from reading his report that he examined. Okay. In any event, even the ophthalmologist that was quoted there didn't dispute. There's never been any suggestion that the delay caused the vision loss. And that's supported by the fact that no other specialist has ever recommended any different treatment. And they have noticed that there's a risk. The defendants, even if they knew, didn't have any notice. And what ‑‑ that's an argument Mr. Singleton is making, that the defendants failed to diagnose. And this Court has held that a failure to diagnose does not constitute deliberate indifference. I see you're over your time. Thank you very much, Ms. Young. Thank you. Ms. Hatch, back to you. I believe you had about 30 seconds left. May it please the Court. I'd like to address the causation issue. Mr. Singleton provided enough evidence from which a reasonable jury could infer that had he been seen in that two-month time period in which he was experiencing eye pain and swelling, he had gone to an ophthalmologist, that that ophthalmologist could have prevented that harm. Defendants delayed for 11 months in actually sending him to an ophthalmologist. And if the district court is going to grant summary judgment saying Mr. Singleton is not a doctor, he can't testify as to causation, then it should have appointed him an expert. Did Dr. Cano, in September of 2006, issue the urgent request, is that right? That's correct. My note was, and this may be wrong, that Dr. Yousef, as the chief medical officer, denied that. That's correct. That's at ER 166, Your Honor. Denied it, and that was deliberate indifference. He needed to see an ophthalmologist on an urgent basis, and he wasn't provided the opportunity to do so, and he suffered permanent vision loss. Thank you. I see you're out of time. Thank you to both counsel, and especially to you, Ms. Housh. I understand you and your firm took this on a pro bono basis, and we are very grateful for your having done so. Thank you. Thank you, Your Honor. The case just argued is submitted.
judges: Ripple, Silverman, Gould